# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| GARDELL COWART,<br><br>    Plaintiff,<br><br> v.<br><br>RAHMAN, et al.,<br><br>    Defendants. | Case No. 1:16-cv-00004-AWI-SKO (PC)<br><br>**FINDINGS AND RECOMMENDATIONS TO DENY PLAINTIFF'S MOTION FOR SUMMMARY JUDGMENT AND TO GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**(Docs. 58, 63)**<br><br>**OBJECTIONS DUE WITHIN 21 DAYS** |

## INTRODUCTION

   Plaintiff, Gardell Cowart, is a state prisoner proceeding *pro se* and *in forma pauperis* filed this action on January 4, 2016. Plaintiff proceeds in this action on claims of deliberate indifference to his serious medical needs in violation of the Eight Amendment against Dr. Igbinosa, Dr. Schraffenberg, Dr. Kandkborova,[1] Dr. Ugwueze, and Dr. Sunduram ("Defendants"). Plaintiff's claims are based on events that occurred on January 9, 2015, after his spinal surgery at Sierra Vista Regional Medical Center by neurosurgeon Donald Ramberg, M.D., who is not a defendant in this action.

   On February 9, 2018, Plaintiff filed a motion for summary judgment on the merits of his claims against Defendants. (Doc. 58.) Defendants filed an opposition (Doc. 62), and Plaintiff did

---

[1] Based on the declaration, the surname of this defendant is spelled "Kandkhorova." (*See* Doc. 63-6.) However, it is spelled "Kandkborova" in this order because that spelling is consistently used by defense counsel in this action aside from the doctor's declaration.

not file a reply.  On March 1, 2018, Defendants filed a motion for summary judgment on the merits of Plaintiff's claims.  (Doc. 63.)    Plaintiff was informed of the requirements to oppose Defendants' motion and filed an opposition.  (Docs. 65, 68.)  Defendants filed a reply.  (Doc. 70.)  Both motions are deemed submitted.  L.R. 230 (*l*).

For the reasons discussed below, the Court recommends denying Plaintiff's motion summary judgment and granting Defendants' motion for summary judgment.

**SUMMARY JUDGMENT STANDARDS**

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Washington Mutual Inc. v. U.S.*, 636 F.3d 1207, 1216 (9th Cir. 2011).  An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.,* 818 F.2d 1422, 1436 (9th Cir. 1987).  The Court determines only whether there is a genuine issue for trial and in doing so, it must liberally construe Plaintiff's filings because he is a *pro se* prisoner.  *Thomas v. Ponder*, 611 F3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

In addition, Rule 56 allows a court to grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to a particular claim or portion of a claim.  Fed. R. Civ. P. 56(a); *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . .") (internal quotation marks and citation omitted).  The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same.  *See* Fed. R. Civ. P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F.Supp.2d 1192, 1200 (S.D. Cal. 1998).

Each party's position must be supported by (1) citing to particular portions of the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)

(quotation marks omitted). The Court may consider other materials in the record not cited by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *accord Simmons v. Navajo County, Ariz.,* 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "But where the moving party has the burden - the plaintiff on a claim for relief or the defendant on an affirmative defense - his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting from W. Schwarzer, <u>Summary Judgment Under the Federal Rules: Defining Issues of Material Fact</u>, 99 F.R.D. 465, 487 (1984)). As to Plaintiff's motion for summary judgment, Plaintiff must demonstrate that there is no triable issue as to the cognizable matters alleged in his complaint. *Id*. This requires Plaintiff to establish beyond controversy every essential element of his claim(s). *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992); *Fontenot v. Upjohn Co*., 780 F.2d 1190, 1194 (5th Cir. 1986). Plaintiff's evidence is judged by the same standard of proof applicable at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

If the moving party meets their initial burden, the burden then shifts to the opposing party "to designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp.,* 627 F.3d at 387 (citing *Celotex Corp.,* 477 U.S. at 323). This requires Plaintiff to "show more than the mere existence of a scintilla of evidence." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

In judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, *Soremekun v. Thrifty Payless Inc.,* 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, *Comite de Jornaleros de Redondo Beach v.*

*City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted), *cert. denied*, 132 S.Ct. 1566 (2012). The Court determines only whether there is a genuine issue for trial, and in doing so, it must liberally construe Plaintiff's filings because he is a *pro se* prisoner. *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

## FINDINGS

### A.    Plaintiff's Claims

This action proceeds on Plaintiff's First Amended Complaint ("FAC") (Doc. 15) for deliberate indifference to his serious medical needs in violation of the Eighth Amendment. (Docs. 23, 30.) Plaintiff's claims are based on the care and treatment he received following a surgical procedure on his cervical spine in 2015. Plaintiff alleges the Defendants failed to follow the instructions given by his surgeons which caused Plaintiff to endure extreme pain and the surgical site to become infected.

Specifically, Plaintiff alleges that on January 9, 2015, he was transported to Sierra Medical Center where Dr. Ramberg, who is not a defendant, performed a surgery on Plaintiff's cervical spine ("Dr. Ramberg's First Surgery"). (Doc. 15, p. 6.) Post-surgical care instructions included daily dressing changes, a prescription for medication for pain, and a list of warning signs for possible infection. (*Id.*) Upon arrival at SATF, Plaintiff was placed in general population and allegedly almost immediately began to experience nausea, dizziness, heat flashes, severe pain, and drainage of bloody yellowish fluid from the surgery site which required 6-8 dressing changes per day. (*Id.*) Non-defendant RN Corey reported Plaintiff's symptoms to his primary care provider ("PCP"), Dr. Igbinosa. (*Id.*) However, Dr. Igbinosa allegedly ignored RN Corey's reports until January 24, 2015, when Plaintiff was sent to Mercy Hospital in Bakersfield, California. (*Id.*, at p. 7.) After various tests at Mercy Hospital, it was determined that Plaintiff had contracted an infection—Methicillin-Resistant Stapholoccus Aureus ("MRSA"). (*Id.*)

//

Dr. Serxner, who is not a defendant, performed surgery to clean out the infection. Upon arrival back at SATF, Plaintiff was placed in the Central Treatment Facility ("CTC"). (*Id.*) Per Dr. Serxner's order, Plaintiff was placed on Vancomycin via a peripherally inserted central catheter ("PICC line"). (*Id.*) Dr. Serxner prescribed a treatment plan for Plaintiff consisting of morphine and oxycarbazepine for pain, flexeril for muscle spasms, and vancomycin for infection. (*Id.*) However, despite Plaintiff's continuing high level of pain, his new PCP, Dr. Kandkborova, reduced Plaintiff's dosage of morphine and repeatedly replaced it with Tylenol with Codeine ("Tylenol #3"). (*Id.*, at p. 8.) This caused Plaintiff to remain in severe pain. (*Id.*) In an attempt to contact his family and out of fear of mistreatment from prison staff, Plaintiff removed the PICC line so he could be placed back in the general population. (*Id.*) Dr. Kandkborova gave Dr. Igbinosa instructions to take over Plaintiff's care and treatment. (*Id.*) These new instructions consisted of an antibiotic other than vancomycin and a low dose of morphine—neither of which complied with Dr. Serxner's prescriptions. (*Id.*) Plaintiff then relapsed and was returned to the hospital where a fluid collection was once again discovered on his spine. (*Id.*) Upon return to SATF, Plaintiff was placed back on morphine and vancomycin, and Dr. Schraffenberg became his PCP. (*Id.*) Dr. Schraffenberg discontinued Plaintiff's morphine and referred him for an MRI. (*Id.*)

Plaintiff was once again placed in the CTC and Dr. Kandkborova again became his PCP. (*Id.*) Dr. Kandkborova acknowledged Dr. Serxner's post-surgical treatment plan and continued Plaintiff on vancomycin, but lowered Plaintiff's dosage of morphine, thereby causing him to continue to experience severe pain. (*Id.*) Once the vancomycin treatment was completed, Plaintiff was returned to the general population where Dr. Schraffenberg was once again assigned as Plaintiff's PCP. (*Id.*) Dr. Schraffenberg obtained the results of the MRI he had previously ordered and referred Plaintiff back to Dr. Ramberg for consultation regarding Plaintiff's spine. (*Id.*, at pp. 8-9.) Dr. Ramberg recommended another surgery ("Dr. Ramberg's Second Surgery") for a new bulging disc in Plaintiff's spine. (*Id.*, at p. 9.)

Dr. Sundaram discussed the risks and benefits of the surgery with Plaintiff and sent a request for surgery to Chief Medical Officer ("CMO") Dr. Ugwueze. (*Id.*) However, despite

Plaintiff's continuing and increasing pain, Dr. Ugwueze denied the surgery and requested additional information on the risks and potential relief to be gained from it. (*Id.*) Shortly after Dr. Ugwueze denied the surgery, Dr. Schraffenberg allegedly discontinued Plaintiff's morphine. (*Id.*)

Plaintiff was then transferred to another yard at SATF where Dr. Sundaram was assigned as his PCP. (*Id.*) Dr. Sundaram reviewed Plaintiff's medical file and acknowledged that another surgery had been recommended and that Plaintiff's pain was still very high and was interrupting Plaintiff's sleep. (*Id.*) Dr. Sundaram nonetheless allegedly only prescribed Tylenol #3 for Plaintiff and advised him to obtain medication from mental health to assist with sleep. (*Id.*) Plaintiff was thereafter designated a "high risk medical inmate." (*Id.*)

**B.      Legal Standard Under the Eighth Amendment**

Prison officials violate the Eighth Amendment if they are "deliberate[ly] indifferen[t] to [a prisoner's] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "A medical need is serious if failure to treat it will result in ' "significant injury or the unnecessary and wanton infliction of pain." ' " *Peralta v. Dillard*, 744 F.3d 1076, 1081-82 (2014) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir.2006) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir.1992), overruled on other grounds by *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir.1997) (en banc))

To maintain an Eighth Amendment claim based on medical care in prison, a plaintiff must first "show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show the defendants' response to the need was deliberately indifferent." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quotation marks omitted)).

"Indications that a plaintiff has a serious medical need include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic or substantial pain." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir.

2014) (citation and internal quotation marks omitted); *accord Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012); *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000). Here, neither party disputes that the condition of Plaintiff's cervical spine, which required multiple surgeries and became infected, is a serious medical need.

Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (quoting *Whitley*, 475 U.S. at 319). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir.2004). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Id.* at 1057 (quoting *Farmer*, 511 U.S. at 837). "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" *Id.* (quoting *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1188 (9th Cir. 2002)).

In medical cases, this requires showing: (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. *Wilhelm*, 680 F.3d at 1122 (quoting *Jett*, 439 F.3d at 1096). More generally, deliberate indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Id.* (internal quotation marks omitted). Under *Jett*, "[a] prisoner need not show his harm was substantial." *Id.*; *see also McGuckin*, 974 F.2d at 1060.

Plaintiff's allegations were found to state cognizable claims against Dr. Igbinosa, Dr. Schraffenberg, Dr. Kandkborova, Dr. Sundaram, and CMO Dr. Ugwueze for acknowledging and ignoring the treatment plans and surgical recommendations of Plaintiff's outside specialists (Dr. Ramberg and Dr. Serxner). *See Snow v. McDaniel*, 681 F.3d 978, 986 (9th Cir. 2012) (concluding that reliance on "non-specialized" medical conclusions may constitute deliberate indifference to a plaintiff's medical needs), overruled on other grounds by *Peralta*, 744 F.3d 1076; *Wakefield v. Thompson*, 177 F.3d 1160, 1165 (9th Cir. 1999) ("[A]llegations that a prison

official has ignored the instructions of a prisoner's treating physician are sufficient to state a claim for deliberate indifference.").

C. **The Motions**[2]

1. **Defendants' Evidence**

Defendants' evidence reveals that Plaintiff received treatment for cervical pain at CSTAF for several years. (Doc. 63-2, Defendants' Separate State of Undisputed Material Facts ("UMF"), 1.) On January 9, 2015, Dr. Ramberg performed his first surgery on Plaintiff, a right C5-C6 and right C6-C7 laminectomy and foraminotomy, at an outside facility. (UMF 2.) Plaintiff returned to CSTAF on January 11, 2015. (UMF 3.)

CDCR requires that all facilities have a Pain Management Committee ("PMC") that meets to determine the appropriate prescription of medications for inmates. (UMF 9.) The PMC at CSTAF, which consists of a team of physicians and the CMO, met and developed Plaintiff's medication plan. (UMF 10.) The policy has been made and promulgated by facility medical leadership in the interest of patient safety. (UMF 11.) The State of California Correctional Healthcare Services ("CCHS") has developed pain management guidelines which must be followed by all CDCR prison medical personnel. (UMF 12.) These guidelines were developed to standardize the effective assessment, management and treatment of patients with chronic pain. (UMF 13.) It is generally not possible to relieve all pain in patients with chronic pain. The goal of treatment is to maximize function while avoiding the serious side effects of stronger pain medications. (UMF 14.) CCHS requires that opioids such as Tylenol #3 be prescribed for short periods of not more than 14 days for breakthrough pain. (UMF 15.) The guidelines recommend that non-opioid analgesics be used for treatment of chronic pain. (UMF 16.)

Plaintiff was prescribed Tylenol #3 when he returned to CSTAF following his surgery on January 11, 2015. (UMF 17.) Dr. Igbinosa first treated Plaintiff post-surgery on January 13, 2015. (UMF 18.) She reviewed Dr. Ramberg's operative report and post-operative discharge

---

[2] Rather than evaluating the parties' motions, oppositions and replies two times, the evidence submitted by each party is considered in light of each party's burden when moving for summary judgment. If a party meets its burden, the opposing party's evidence will be evaluated under the appropriate standards.

instructions and examined Plaintiff's surgical wounds which appeared to be healing. (*Id.*) Plaintiff appeared comfortable, but complained of pain and insisted on morphine instead of Tylenol #3. (UMF 19.) Dr. Igbinosa allowed a tapering dose of morphine based on the recent surgery, but expected Plaintiff's pain symptoms to improve and did not believe extended use of morphine was necessary. (UMF 20.)

Nursing staff continued to provide daily wound care and change of dressings pursuant to Dr. Ramberg's wound care instructions. On January 23, 2015, nursing staff informed Dr. Igbinosa that Plaintiff had increased drainage during a change in dressing. (UMF 21.) Upon learning of this, Dr. Igbinosa contacted Dr. Ramberg who recommended a CT to check the surgical site. (UMF 22.) Dr. Igbinosa conveyed these instructions to the on-call physician at CSTAF who carried them out. (UMF 23.)

Plaintiff was taken to Mercy Hospital for evaluation where he was diagnosed and treated for MRSA at the cervical surgical site. Plaintiff was released from the hospital and returned to CSTAF on February 2, 2015. Dr. Kitt, an infectious disease specialist who treated Plaintiff's MRSA infection at the hospital, recommended a PICC line for IV antibiotic treatment with vancomycin and rifampin for a period of five weeks because of the proximity of the infection to the surgical site.

Upon returning to CSTAF, Plaintiff was housed in the Central Treatment Facility ("CTF") unit at the prison, because the recommended PICC line IV antibiotic treatment required a higher level of care. (UMF 24.) Plaintiff refused the recommended treatment. (UMF 25.) On February 2 and February 3, 2015, Dr. Kandkborova examined Plaintiff and explained the risks of not complying with the recommended treatment for MRSA infection. (UMF 26.) As Plaintiff refused the prescribed treatment, Dr. Kandkborova contacted Dr. Kitt to discuss alternative treatments for Plaintiff's infection. (UMF 27.) Dr. Kitt recommended oral Zyvok for 4 weeks. Dr. Kandkborova changed Plaintiff's medication as recommended. (UMF 28.) On February 4, 2015, Plaintiff was discharged from the CTF unit because he was no longer receiving IV antibiotics and did not need a higher level of care. (UMF 29.) Plaintiff was followed by his other physicians when he returned to his regular unit at the prison.

Dr. Ramberg saw Plaintiff for re-evaluation on February 11, 2015, and recommended

physical therapy.  On February 12, 2015, Plaintiff saw Dr. Igbinosa for a follow-up visit and requested morphine.  (UMF 30.)  Dr. Igbinosa examined Plaintiff and noted improved grip strength.  Based on her examination, medical training and experience, Dr. Igbinosa did not believe morphine was necessary to treat Plaintiff's pain.  (UMF 31.)  Based on Dr. Ramberg's recommendation, Dr. Igbinosa submitted a request for authorization of physical therapy.  (UMF 32.)  During all of Dr. Igbinosa's interactions with Plaintiff, she treated and examined him, responded to his complaints, and recommended treatment she felt in her clinical judgment was appropriate.  (UMF 33.)  She never disregarded a serious medical need or knowingly disregarded Plaintiff's pain or condition.  (UMF 34.)

On March 10, 2015, Dr. Igbinosa saw Plaintiff for follow-up visit during which Plaintiff admitted having improved function, but claimed he still had pain.  (UMF 35.)  Dr. Igbinosa reviewed Plaintiff's recent MRI which noted fluid around the spine, which she believed was likely related to the MRSA infection.  (UMF 36.)  Dr. Igbinosa conducted a physical examination and recommended the previously prescribed IV antibiotics which Plaintiff refused.  (UMF 37.)

On March 23, 2015, Plaintiff saw Dr. Kandkborova when he returned to CSTAF and was placed in the CTC unit.  Plaintiff had been hospitalized at an outside facility and the doctors again recommended vancomycin and Zyvok for 3 weeks.  (UMF 38.)  Plaintiff continued to refuse the PICC line and instead took IV antibiotics through a peripheral line.  Dr. Kandkborova temporarily discontinued the prescription for Balcofen because of potential interactions between that medication and antibiotic Zyvok, and gave a short-term prescription of morphine as needed for pain.  (UMF 39.)

On March 27, 2015, Plaintiff had a PICC line placed for treatment of the MRSA at an outside facility.  Dr. Schraffenberg examined Plaintiff when he returned to CSTAF on March 29, 2015.  The PICC line was in place and Plaintiff continued with recommended treatment.  (UMF 40.)

On March 30, 2015, Dr. Kandkborova again examined Plaintiff's neck and found no open wound, redness or swelling and noted that Plaintiff denied neck pain.  (UMF 41.)  Dr. Kandkborova discontinued Plaintiff's morphine prescription because he was no longer taking

Zyvok, and returned Plaintiff to his normal pain medications. (UMF 42.) Dr. Kandkborova recommended that Plaintiff have another MRI to check the infection and progress of the healing from the surgery, and follow up as requested by the neurosurgeon Dr. Ramberg once Plaintiff completed antibiotics. (UMF 43.)

On April 9, 2015, Dr. Kandkborova examined Plaintiff's neck, finding full range of motion and no tenderness to palpation. (UMF 44.) A repeat MRI to check the infection and healing process of the cervical surgery had been scheduled for April 21, 2015. Dr. Kandkborova last saw Plaintiff on April 13, 2015, and continued Plaintiff's Flexeril prescription for chronic neck pain. (UMF 45.) During all of Dr. Kandkborova's interactions with Plaintiff, she treated Plaintiff and recommended treatment that, in her clinical judgment, was appropriate. (UMF 46.) At no time did Dr. Kandkborova disregard any physician's recommendation for post-surgical care or treatment of the MRSA infection (UMF 47), disregard any serious risk of injury or Plaintiff's pain (UMF 48), or knowingly or intentionally cause Plaintiff to have pain, suffering, or injury of any kind (UMF 49.)

On April 17, 2015, Dr. Schraffenberg examined Plaintiff, who was seeking a stronger pain medication, despite indicating his pain had improved since completion of antibiotic treatment. (UMF 50.) Dr. Schraffenberg was aware that Plaintiff was scheduled for MRI on April 21, 2015, and declined to change his prescribed pain medications until the MRI was completed. (UMF 51.)

Dr. Schraffenberg last saw Plaintiff on April 28, 2015. During the visit, Plaintiff complained of increased pain that was interfering with his sleep. (UMF 52.) Dr. Schraffenberg continued Plaintiff's pain medications as previously approved by the PMC. (UMF 53.) Further, pursuant to CDCR guidelines, the PMC, not an individual doctor, determined medication changes. (UMF 54.) During all of Dr. Schraffenberg's interactions with Plaintiff, he treated Plaintiff and recommended treatment that, in his clinical judgment, was appropriate. (UMF 55.) Dr. Schraffenberg never disregarded any significant risk of further injury or pain to Plaintiff. (UMF 56.) At no time did Dr. Schraffenberg knowingly or intentionally cause Plaintiff to suffer, pain, suffering or injury of any kind. (UMF 57.)

Plaintiff was transferred to another section of the prison and Dr. Sundaram became his

primary care physician.  Dr. Sundaram first saw Plaintiff on May 29, 2015.  Plaintiff had recently seen Dr. Ramberg who had recommended his Second Surgery -- an anterior discectomy and fusion.  Plaintiff complained of pain in his left arm and thumb and requested morphine.  (UMF 58.)  Dr. Sundaram reviewed Plaintiff's records which showed Plaintiff had not been taking pain medications for several weeks.  (UMF 59.)  Dr. Sundaram examined Plaintiff and based on his findings, clinical training and experience, did not believe morphine was warranted.  (UMF 60.)  Dr. Sundaram completed a request for authorization of Dr. Ramberg's Second Surgery, (UMF 61), and planned to discuss Plaintiff's course of pain management medications at the Medical Authorization Review ("MAR") meeting.  The MAR committee determined Flexeril, Trileptal, and Cymbalta were appropriate medications to manage Plaintiff's pain.  (UMF 62.)

Dr. Sundaram's request for authorization for surgery was denied because further information was needed from the neurosurgeon as to expected outcomes and improvement of function.  Dr. Ugwueze neither disregarded any significant risk of further injury or pain to Plaintiff, nor knowingly or intentionally caused Plaintiff to suffer pain, suffering, or injury of any kind.  (UMF 63.)

On July 27, 2015, Dr. Sundaram saw Plaintiff for a follow up.  Plaintiff complained of weakness in grip and radiating pain, but his grip strength was within normal limits.  Dr. Sundaram discussed Dr. Ramberg's surgical recommendation with Plaintiff, and it appeared that Plaintiff was reluctant to have another surgery and wanted to proceed with pain management treatment options.  (UMF 64.)  Dr. Sundaram discussed the medications with the MAR committee which authorized medications for chronic pain.  (UMF 65.)

On May 12, 2016, Dr. Sundaram saw Plaintiff for a follow up visit.  Plaintiff had new pain complaints in the back of his neck and numbness in his left hand.  (UMF 66.)  Dr. Sundaram performed a neurological examination, agreed to re-start Tripletal and continue Flexeril, and ordered a repeat MRI.  (UMF 67.)

On June 14, 2016, Dr. Sundaram saw Plaintiff for follow up.  The MRI had been completed and Plaintiff reported that Trileptal had helped his symptoms.  Dr. Sundaram increased the dosage of Trileptal, continued Flexeril and Tylenol #3, and referred Plaintiff back to Dr.

Ramberg.  (UMF 68.)

On July 11, 2016, Plaintiff saw Dr. Sundaram for follow-up after seeing Dr. Ramberg and wanted to proceed with surgery instead of continuing pain management treatment.  (UMF 69.) Plaintiff also requested morphine.  (UMF 70.)  Based on Dr. Sundaram's examination, he did not believe there was a clinical need for morphine.  (UMF 71.)  However, Dr. Sundaram agreed to discuss Plaintiff's medication regime with the MAR committee as he was requesting alternative medications, and completed a request for authorization for surgery.  (UMF 72.)

On August 11, 2016, Dr. Sundaram saw Plaintiff for follow up visit.  Plaintiff claimed to have severe neck pain.  Dr. Sundaram performed a physical examination during which Plaintiff appeared comfortable.  (UMF 73.)  Dr. Sundaram did not feel morphine was necessary and continued Plaintiff's pain medications as prescribed.  (UMF 74.)

On September 19, 2016, Plaintiff saw Dr. Sundaram for follow up visit.  Plaintiff noted a small improvement in tingling sensation with Neurontin.  (UMF 75.)  Plaintiff inquired as to why he was not receiving narcotics.  Dr. Sundaram explained the pain management guidelines and that the MAR committee had determined the medications Plaintiff was receiving were appropriate. (UMF 76.)  Dr. Sundaram continued Flexeril for Plaintiff's muscle spasms and increased Plaintiff's dosage of Neurontin.  (UMF 77.)

Plaintiff then had Dr. Ramberg's Second Surgery, an anterior cervical discectomy and fusion of C5-7 at an outside facility.  The discharge instructions recommended morphine for five days.  (UMF 78.)  Dr. Sundaram saw Plaintiff on October 28, 2016.  Plaintiff complained of neck pain.  Dr. Sundaram authorized morphine for 7 to 10 days post-operatively.  (UMF 79.)

Dr. Sundaram last saw Plaintiff on October 31, 2016, at which time Plaintiff requested morphine be continued.  (UMF 80.)  Dr. Sundaram examined Plaintiff and did not believe morphine was indicated.  Plaintiff was prescribed Neurontin, Trileptal, Balcofen, and NSAIDS which was consistent with CDCR pain medication guidelines and authorized by the pain management committee.  (UMF 81.)  Dr. Sundaram provided adequate and appropriate care during each of his visits with Plaintiff.  (UMF 82.)  At no time did Dr. Sundaram disregard any significant injury or pain to Plaintiff (UMF 83), or knowingly or intentionally cause Plaintiff pain,

suffering or injury of any kind (UMF 84).

The Court finds that Defendants have met their burden of demonstrating the absence of a genuine issue of material fact as to Plaintiff's claims against them. The burden therefore shifts to Plaintiff to establish a genuine issue as to any material fact to prevent summary judgment in Defendants' favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

### 2. Plaintiff's Evidence

To prevent Defendants' summary judgment, Plaintiff may not simply rely on the allegations or denials of his pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, to establish a dispute. Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11; *First Nat'l Bank,* 391 U.S. at 289; *Strong v. France*, 474 F.2d 747, 749 (9th Cir. 1973). To prevail on his motion for summary judgment, Plaintiff must establish his allegations beyond controversy. *Houghton*, 965 F.2d at 1536; *Fontenot*, 780 F.2d at 1194.

Plaintiff may not defeat Defendants' MSJ, or support his own motion, by simply a filing a stack of documents grouped as exhibits. "[E]ven if an affidavit is on file, a district court need not consider it in opposition to summary judgment unless it is brought to the district court's attention in the opposition to summary judgment." *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). In other words, the Court will not consider any affidavits, declarations, exhibits, or other documents as evidence in support of Plaintiff's motion or opposition unless in his briefs, Plaintiff identifies the documents, where they came from, cites to a specific portion of the documents in support of his opposition, and sets forth arguments explaining how each document supports the arguments and allegations in his brief. "[A] district court is 'not required to comb the record to find some reason to deny [or grant] a motion for summary judgment.'" *Id.* (quoting *Forsberg v. Pacific N.W. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). Although a Court may consider materials that are not cited, *see* Federal Rule of Civil Procedure 56(c)(3), materials submitted that are not specifically cited and accompanied with an explanation as to how they support a position, need not be considered.

Plaintiff has filed numerous pages of exhibits in support of his MSJ. (*See* Doc. 58, pp. 15-98.) Although Plaintiff generally cites to groupings of those pages of exhibits in his MSJ, (*see* Doc. 58, pp. 1-10), he fails to explain which specific documents support each argument. The Court is not required, and cannot attempt to correlate Plaintiff's evidence with the facts he purports entitle him to summary judgment where Plaintiff has failed to do so. Fed. R. Civ. Pro. 56(c)(1). Plaintiff's evidence as presented is insufficient for the Court to find "that no reasonable trier of fact could find other than for" Plaintiff. *Calderone*, 799 F.2d at 259. Even if Plaintiff's motion and evidence were properly presented, the above-referenced evidence submitted by Defendants suffices "to designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp.,* 627 F.3d at 387 (citing *Celotex Corp.,* 477 U.S. at 323). Thus, it is recommended that Plaintiff's MSJ be denied.

Plaintiff did a better job of presenting and identifying evidence on which he relies in opposition to Defendants' MSJ. In his opposition, Plaintiff correctly cites to specific pages within a given exhibit that he contends support his arguments. However, for the reasons discussed below, Plaintiff does not explain or provide any other basis for the Court to find that Plaintiff's exhibits support his contentions. Plaintiff's evidence and arguments for each Defendant are addressed in turn below.

### a.    Dr. Igbinosa

Dr. Igbinosa allegedly did not follow Dr. Ramberg's First Surgery post-operative treatment plan by changing Plaintiff's post-operative pain-killer from morphine to Tylenol #3. (Doc. 15, pp. 6-7, 9.)

Plaintiff states in his opposition that after Dr. Ramberg's first surgery, he was discharged on January 11, 2015, with instructions that "included dispense (sic) of medications for pain." (Doc. 68, p. 3.) Plaintiff cites to his declaration and "Exh A1, pg 3, 4." (*Id.*) In his declaration, Plaintiff states that his post-op instructions included morphine for pain "for a duration of 9-12 days as needed for pain." (*Id.*, p. 29, ¶ 4.) Pages 3 and 4 of Exhibit A1 to Plaintiff's opposition consist of the "*Final Report*" from the hospital's radiology department ordered prior to Dr. Ramberg's First Surgery. (*Id.*, pp. 49, 50.) However, a few pages later in that exhibit reflect a

number of medications Plaintiff apparently received at the hospital, both of which reflect "morphine (morphine 30 mg oral capsule) 1 cap, Oral, Every 12 hours: 9-21, As Needed for pain, Refills: 0." (*Id.*, pp. 53, 54.)  Plaintiff apparently believes the "9-21" note on the line for morphine indicates that he was supposed to receive this dose of morphine for 9-21 days.  However, Plaintiff provides no basis to support this conclusion from a mere notation of "9-21" and the Court finds none.  This is the only evidence to which Plaintiff cites support his allegation that Dr. Igbinosa failed to follow Dr. Ramberg's First Surgery post-operative medication orders when Plaintiff was placed on Tylenol #3 for pain instead of morphine.  Thus, Plaintiff fails "to designate specific facts demonstrating the existence of genuine issues for trial" on this issue.  *In re Oracle Corp.,* 627 F.3d at 387.

Plaintiff's evidence also shows that Dr. Hashimi, who is not a defendant, is the physician who ordered Tylenol #3 for Plaintiff when he arrived at CSATF after his discharge from the hospital on January 11, 2015, following Dr. Ramberg's First Surgery.  (Doc. 68, p. 71.)  Dr. Igbinosa continued Plaintiff's Tylenol #3 prescription when she saw him on January 13, 2015, but changed Plaintiff's pain medicine to morphine the next day, ordering that Plaintiff receive 30 mg doses, twice a day, for ten days, followed by 15 mg doses twice a day for the next ten days, and 15 mg doses once a day for 10 days thereafter.  (Doc. 68, p. 74.)  Dr. Igbinosa prescribed morphine for Plaintiff's pain for 30 days, and Plaintiff's own evidence fails to show that Dr. Igbinosa was deliberately indifferent to Plaintiff's condition and changed his post-op pain medication prescription from morphine to Tylenol #3.  Thus, Dr. Igbinosa's motion for summary judgment should be granted on Plaintiff's allegation that she changed Plaintiff's post-op pain medication from morphine to Tylenol #3 in violation of his surgeon's orders.

Plaintiff's claim against Dr. Igbinosa also alleges she ignored his post-operative symptoms which delayed Plaintiff's referral to the hospital for treatment of his MRSA infection. (Doc. 15, pp. 6-7, 9.)  Plaintiff alleges that on January 16, 2015, during a dressing change, the nurse noted his pain was 9/10 and that Plaintiff had a moderate amount of drainage from a small hole in the otherwise healing surgical site.  (Doc. 68, p. 3.)  Plaintiff states that Dr. Igbinosa was notified of his pain level and the drainage issue on January 16, 2015.  (Doc. 68, pp. 3, 29.)

However, the exhibit to which he refers as supporting evidence is a nursing note that simply states "Notified MD. MD will see I/P during MD line." (Doc. 68, p. 77.) This does not incontrovertibly show that Dr. Igbinosa was the "MD" who was informed of Plaintiff's pain and drainage on January 16, 2015. Dr. Igbinosa's evidence does not reflect any involvement with Plaintiff's care between January 13, 2015, and January 23, 2015, other than changing Plaintiff's pain medication from Tylenol #3 which Dr. Hashimi prescribed, back to morphine. Further, although Plaintiff contends that the surgical site drainage was so extensive that it required 6-8 dressing changes a day, (Doc. 68, p. 30), the supporting records he submitted reflect that Plaintiff's dressing was only changed twice a day, (*id.*, pp. 78-81).

Dr. Igbinosa's declaration states that she was not notified about the changes in Plaintiff's surgical wound until January 23, 2015, when she was so informed by the wound care nurse. (Doc. 63-4, p. 3.) The next day, the drainage from the hole greatly increased to the point of projectile evacuation while the wound care nurse was changing Plaintiff's bandages. (Doc. 68, pp. 4, 29, 81.) Dr. Igbinosa's evidence indicates that when the wound care nurse informed her of this development, Dr. Igbinosa immediately called neurosurgeon Dr. Ramberg and discussed Plaintiff's condition with him. (Doc. 63-4, p. 3.) On January 24, 2017, Dr. Igbinosa called Dr. Metts, the on-call physician at CSATF who thereafter sent Plaintiff to Mercy Hospital ER. (Doc. 58, p. 45; Doc. 63-4, pp. 3, 9-11.) This coincides with the evidence submitted by Plaintiff, (Doc. 68, pp. 77-81), rather than with Plaintiff's rendition of events, (*id.*, pp. 3, 4, 29, 30).

Thus, Plaintiff fails to establish the essential elements of his claim that Dr. Igbinosa ignored and delayed the receipt of medical care for his post-surgical infection to support the conclusion that no reasonable trier of fact could find for Dr. Igbinosa, *Houghton*, 965 F.2d at 1536, and "to designate specific facts demonstrating the existence of genuine issues for trial" on this issue, *In re Oracle Corp.,* 627 F.3d at 387. Plaintiff's MSJ on his claim that Dr. Igbinosa ignored and delayed treatment for his post-surgical infection should be denied and Dr. Igbinosa's MSJ should be granted. Dr. Igbinosa should be dismissed from this case since she is entitled to summary judgment on both of Plaintiff's claims against her.

## b. Dr. Kandkborova

Plaintiff alleges that Dr. Kandkborova failed to follow the treatment for Plaintiff's MRSA infection recommended by Dr. Serxner, who allegedly treated Plaintiff's MRSA infection at Mercy Hospital. (Doc. 15, pp. 7-9.) However, Plaintiff's own exhibits show that Dr. Serxner was the surgeon who drained Plaintiff's abscess and collected culture specimens which tested positive for MRSA, (Doc. 58, pp. 52-53), Dr. Kitt provided the infectious disease consultation and directed the treatment for Plaintiff's MRSA infection at Mercy Hospital, (*id.*, pp. 50-51), and Dr. Shah discharged Plaintiff from Mercy Hospital, noting that Plaintiff was to receive vancomycin every 8 hours via PICC line for another five weeks and rifampin 600 mg by mouth daily for another 2 weeks, (*id.*, pp. 54-55).

In opposition to Defendants' MSJ, Plaintiff contends that on January 30, 2015, upon his arrival at CSATF after release from Mercy Hospital, he was placed in isolation in the Central Treatment Center ("CTC"). (Doc. 68, pp. 4, 5, 32.) Plaintiff's exhibits reveal that in the CTC, he received vancomycin via IV for the MRSA infection, until Plaintiff pulled out the PICC line on February 2, 2015. (*Id.*, pp. 119-121.) Plaintiff states he did this because he was "under duress and severe pain" in an attempt to get moved out of the CTC. (*Id.*, pp. 5, 32, 119-121.) Plaintiff's exhibits also reveal that Plaintiff thereafter refused IV antibiotics, but agreed to take oral antibiotics. (*Id.*, p. 123.)

Plaintiff states in his declaration that Dr. Kandkborova "kept changing [his] medication" for treatment of his infection. (Doc. 68, p. 32, ¶33.) However, Plaintiff's exhibits reveal that the antibiotic for Plaintiff's MRSA infection was changed to "oral zyvox(linezolid)" after consultation with the infections disease doctor at Mercy (Dr. Kitt), because Plaintiff pulled out the PICC line. (Doc. 58, p. 67, 77.) Plaintiff submits neither exhibits nor any other evidence that Dr. Kandkborova prescribed medications for his MRSA infection which were not medically indicated or reasonable, or contrary to the recommendation of the infectious disease specialist. Plaintiff similarly fails to show that he has knowledge or specialized training on medical issues to render an opinion that is inconsistent with physicians on medical issues.

//

Thus, Plaintiff fails to establish the essential elements of his that Dr. Kandkborova failed to follow the treatment for Plaintiff's MRSA infection as recommended by the infectious disease specialist at Mercy Hospital, Dr. Kitt, to support the conclusion that no reasonable trier of fact could find for Dr. Kandkborova. *Houghton*, 965 F.2d at 1536. Plaintiff also fails to demonstrate "the existence of genuine issues for trial" on this issue to meet his burden in opposing Defendants' MSJ. *In re Oracle Corp.*, 627 F.3d at 387. Accordingly, Plaintiff's MSJ on his claim that Dr. Kandkborova ignored and failed to follow the treatment for Plaintiff's MRSA infection as recommended by the infectious disease specialist should be denied, and Dr. Kandkborova's MSJ should be granted.

Plaintiff also alleges that Dr. Kandkborova reduced Plaintiff's dosage of morphine in contravention to Dr. Serxner's recommended treatment after Plaintiff's discharge from Mercy Hospital for the MRSA infection. (Doc. 15, pp. 7-9.) Plaintiff's evidence reveals that when he was discharged from the hospital on January 30, 2015, after Dr. Serxner's procedure, Plaintiff received morphine sulfate, 15 mg, by mouth twice a day, which was to continue as needed for pain. (Doc. 68, p. 107.) However, Plaintiff fails to submit any evidence regarding the length of time that Dr. Serxner recommended he receive morphine, or any evidence to establish that Dr. Kandkborova discontinued it. (*See* Doc. 68.)

Thus, Plaintiff fails to establish the essential elements of his claim that Dr. Kandkborova discontinued Dr. Serxner's morphine prescription so as to conclude that no reasonable trier of fact could find for Dr. Kandkborova, *Houghton*, 965 F.2d at 1536, and "to designate specific facts demonstrating the existence of genuine issues for trial" on this issue to meet his burden on opposing Defendants' MSJ, *In re Oracle Corp.*, 627 F.3d at 387. Plaintiff's MSJ on his claim that Dr. Kandkborova terminated Dr. Serxner's morphine prescription should be denied, and Dr. Kandkborova's MSJ on this issue should be granted. Dr. Kandkborova should be dismissed from this case since she is entitled to summary judgment on both claims against her.

### c.    Dr. Schraffenberg

Plaintiff was seen by Dr. Ramberg, via telemed, for neurosurgery follow up on February 11, 2015. (Doc. 68, pp. 5, 131-136.) Dr. Ramberg believed Plaintiff's continuing pain in the

cervical region was muscular in origin due to Dr. Serxner's surgery, and recommended physical therapy, ordered an x-ray of Plaintiff's cervical spine, and suggested that the infectious disease consultant order a follow-up MRI. (*Id.*) Plaintiff alleges that he had "a relapse" which caused such increased pain in his neck that he started having chest pains for which he was sent to San Joaquin Hospital on March 4, 2015. (Doc. 69, p. 5, 32, 138-170.) Plaintiff was given IV vancomycin (since he refused a PICC line) and was discharged on March 6, 2015, with recommendation to continue IV vancomycin.[3] (*Id.*)

Plaintiff's claim against Dr. Schraffenberg is based on allegations that his discharge from San Joaquin Hospital in April of 2015, Dr. Schraffenberg allegedly discontinued the morphine and vancomycin that had been prescribed by Dr. Serxner. (Doc. 15, pp. 8-9.) In opposition to Defendants' MSJ, Plaintiff states that on April 24, 2015, he presented to Dr. Schraffenberg, begging for help with the pain in his neck and requesting the treatment prescribed by Dr. Serxner, but Dr. Schraffenberg refused. (Doc. 68, p. 6.) However, the exhibits to which Plaintiff cites in support of this contention do not show that Dr. Schraffenberg was involved—in any way—with Plaintiff's care and treatment on April 22, 2015. (*See* Doc. 68, pp. 179-180.) They instead show that Plaintiff was seen on that date by "L. Shepard, RN," who did not note contacting any physician regarding Plaintiff's complaints, or make any note of referring Plaintiff to a physician. (*Id.*)

Plaintiff's exhibits also reveal that Plaintiff was seen by another RN on April 24, 2015, at which time Plaintiff demanded stronger pain medication than he was receiving at the time. (*Id.*, p. 184.) The RN contacted Dr. Schraffenberg via telephone, who directed to continue Plaintiff's current pain management until April 28, 2015, when Plaintiff was scheduled to see Dr. Schraffenberg. (*Id.*) Plaintiff's exhibits also show that, on April 28, 2015, Plaintiff was seen by Dr. Schraffenberg who noted that on April 21, 2015, Plaintiff was not able to complete a previously ordered MRI and that Gadolinium was not used, noting Gadolinium is necessary to

---

[3] Other treatment recommendations were also made at this time, but they are not relevant to Plaintiff's claims in this action.

define the condition of any remaining abscess. (*Id.*, p. 182.) Dr. Schraffenberg's plan for treating Plaintiff's cervical spine was to discuss Plaintiff's situation with Dr. Schraffenberg's superior. (*Id.*)

Plaintiff was then seen by another nurse on May 6, 2015, who noted that Plaintiff received pain management for chronic cervical pain which Plaintiff acknowledged, and he requested more information on pain management alternatives. (*Id.*, pp. 186-187.) The nurse noted that, "per Dr. Schraffenberg," Plaintiff had an upcoming routine visit scheduled for May 8, 2015. (*Id.*) The nurse further noted that Dr. Schraffenberg had discussed Plaintiff's case with another physician (name illegible) and that apparently another MRI was not indicated at this time, but that Plaintiff's case was scheduled to be discussed with the MAR committee. (*Id.*, p. 187.)

Plaintiff submits no evidence to show that Dr. Schraffenberg wrongly discontinued any of his medications in deliberate indifference to Plaintiff's cervical condition. (*See* Doc. 68.) To the contrary, Plaintiff's own evidence reveals that Dr. Schraffenberg directed Plaintiff's pain management course to continue and scheduled medications for Plaintiff's pain for discussion with the MAR committee. Thus, Plaintiff fails both to establish the essential elements of his claim that Dr. Schraffenberg discontinued Plaintiff's antibiotics and/or pain medications to support the conclusion that no reasonable trier of fact could find for Dr. Schraffenberg. *Houghton*, 965 F.2d at 1536. Similarly, Plaintiff fails to demonstrate "the existence of genuine issues for trial" on his claim against Dr. Schraffenberg to meet his burden on opposing Defendants' MSJ. *In re Oracle Corp.,* 627 F.3d at 387. Plaintiff's MSJ on his claim against Dr. Schraffenberg should be denied and Dr. Schraffenberg's MSJ thereon should be granted. Dr. Schraffenberg should be dismissed from this case.

### d.     Dr. Sundaram

Plaintiff's claim against Dr. Sundaram is based on allegations that from May of 2015 until October 26, 2016, the date of Dr. Ramberg's Second Surgery, Dr. Sundaram failed to prescribe morphine instead simply prescribing Tylenol #3 for Plaintiff's pain and recommending that Plaintiff obtain medications from mental health to help him sleep. (Doc. 15, p. 9.)

//

Plaintiff's evidence shows that on May 13, 2015, Plaintiff was moved to A-yard and Dr. Sundaram became his PCP.  (Doc. 68, p. 6.)  On May 15, 2015, Plaintiff was again seen by neurosurgeon Dr. Ramberg, who recommended another surgery ("Dr. Ramberg's Second Surgery") with which Plaintiff wished to proceed.  (*Id.*, pp. 193-194.)  On May 29, 2015, Dr. Sundaram submitted a physician request for services seeking authorization for Dr. Ramberg's Second Surgery for Plaintiff, which Dr. Ugwueze denied on June 17, 2015.  (*Id.*, p. 195, Doc. 58, p. 92.)  In the denial, Dr. Ugwueze requested Dr. Sundaram to "Please discuss directly with this surgeon regarding the goals and anticipated outcome of this plan given the existing morbidity.  I am concerned about worsening of patient's functional status and pain after another procedure given what already exists.  Your note also did not describe present neuromuscular status."  (*Id.*)

Plaintiff contends that one year later, on June 14, 2016, Dr. Sundaram was deliberately indifferent to Plaintiff's cervical spine condition by noting that Plaintiff had declined Dr. Ramberg's Second Surgery when Dr. Sundaram initially attempted to obtain authorization for it in 2015.  (Doc. 68, p. 7.)  Plaintiff submits evidence showing that, on December 28, 2015, Dr. Sundaram submitted a request for neurosurgery consult for Plaintiff which noted Dr. Ramberg's May 2015 Second Surgery recommendation, and indicated that "Pt opted against surgery at that time." (Doc. 58, pp. 93, 94.)  Dr. Sundaram repeated the comment that, in May of 2015, Plaintiff opted against Dr. Ramberg's Second Surgery in a progress note dated June 14, 2016.  (Doc. 68, p. 196.)  However, the Court is at a loss to understand how Plaintiff was damaged by this notation on Dr. Sundaram's December 28, 2015 request for authorization of Dr. Ramberg's Second Surgery—particularly since this request was approved.  (Doc. 58, p. 94.)

Further, Plaintiff presents no evidence to contradict Dr. Sundaram's July 27, 2015 progress note, submitted in support of Defendants' MSJ, in which Dr. Sundaram noted discussing Dr. Ramberg's Second Surgery recommendation with Plaintiff and that "on discussing with pt (sic) today he seem (sic) reluctant to have another surgery on his neck at this point and would like to start by managing his pain." (*Compare* Doc. 63-8, p. 10 with Doc. 58 & Doc. 68.)  It is this note, which Plaintiff neither acknowledges nor contradicts, on which Dr. Sundaram relies in his subsequent notes and requests for services on Plaintiff's behalf.  Likewise, Plaintiff's own

evidence reveals that on March 3, 2015, when he was seen by an RN who informed Plaintiff he had a telemed neurosurgery follow-up scheduled for March 20, 2015, the RN noted Plaintiff "states he will refuse not receptive to discussing issue. . . ." (Doc. 58, p. 83.)

The Court notes that if in May of 2015, Dr. Sundaram did not request authorization for Plaintiff to receive Dr. Ramberg's Second Surgery, or if Dr. Sundaram responded to an inquiry by the authorizing/supervising physician in mid-2015 by errantly stating that Plaintiff did not want the third surgery, Plaintiff may be able to show deliberate indifference. However, this is not the case. On the contrary, Plaintiff's own evidence reveals that Dr. Sundaram requested authorization for Dr. Ramberg's Second Surgery for Plaintiff on May 29, 2015. (Doc. 58, p. 92.) Although Dr. Sundaram's May 29, 2015 authorization request was denied, Plaintiff submits no evidence to support a finding that Dr. Sundaram caused or contributed to that denial, or failed to subsequently contact Dr. Ramberg, as Dr. Ugwueze requested. Plaintiff also fails to submit any evidence to show what medications he received prior to coming under Dr. Sundaram's care that he contends Dr. Sundaram wrongly changed. Nor does Plaintiff show what medications the specialists had prescribed, or the treatments specialists had ordered, when Plaintiff was under Dr. Sundaram's care which Dr. Sundaram failed to follow.

Thus, Plaintiff fails to establish beyond controversy the essential elements of his claim that Dr. Sundaram discontinued medications prescribed by Plaintiff's specialists, to support he conclusion that no reasonable trier of fact could find for Dr. Kandkborova. *Houghton*, 965 F.2d at 1536. Similarly, Plaintiff fails to demonstrate "the existence of genuine issues for trial" on his claim against Dr. Sundaram to meet his burden on opposing Defendants' MSJ. *In re Oracle Corp.,* 627 F.3d at 387. Plaintiff's MSJ on his claim against Dr. Sundaram should be denied and Dr. Sundaram's MSJ thereon should be granted. Dr. Sundaram should be dismissed from this case since he is entitled to summary judgment.

### e. Dr. Ugwueze

Plaintiff's claim against Dr. Ugwueze is based on allegations that Dr. Ugwueze wrongly denied Dr. Sundaram's request for Plaintiff to receive Dr. Ramberg's Second Surgery. (Doc. 15, p. 9.)

The evidence submitted by both Plaintiff and Defendants shows that Dr. Ugwueze's only involvement in Plaintiff's care and treatment was the June 17, 2015 denial of Dr. Sundaram's request for authorization of Dr. Ramberg's Second Surgery. (*Compare* Doc. 58, pp. 9, 92; Doc. 63-5; Doc. 68, pp. 7, 33, 195.) However, the qualifiers which Dr. Ugwueze placed on the denial, do not show that he denied authorization for Dr. Ramberg's Second Surgery in deliberate indifference to Plaintiff's condition. To the contrary, Dr. Ugwueze was concerned that another surgery might cause more harm than good. As noted above, in the denial, Dr. Ugwueze requested Dr. Sundaram "Please discuss directly with this surgeon regarding the goals and anticipated outcome of this plan given the existing morbidity. **I am concerned about worsening of patient's functional status and pain after another procedure given what already exists**. Your note also did not describe present neuromuscular status." (Doc. 58, p. 92, Doc. 68, p. 195 (emphasis added).) Plaintiff provides neither evidence nor argument to show that Dr. Ugwueze's denial was not based on a legitimate medical concern, given Plaintiff's condition at the time, or that another surgery might worsen Plaintiff's functional status and pain—and the Court finds none.

Thus, Plaintiff fails to establish the essential elements of his claim that Dr. Ugwueze denied authorization for Dr. Ramberg's Second Surgery in deliberate indifference to Plaintiff's condition to prevail on Plaintiff's MSJ to support eh conclusion that no reasonable trier of fact could find for Dr. Ugwueze. *Houghton*, 965 F.2d at 1536. Similarly, Plaintiff fails to demonstrate "the existence of genuine issues for trial" on his claim against Dr. Ugwueze to meet his burden on opposing Defendants' MSJ. *In re Oracle Corp.,* 627 F.3d at 387. Plaintiff's MSJ on his claim against Dr. Ugwueze should be denied and Dr. Ugwueze's MSJ thereon should be granted. Dr. Ugwueze should be dismissed from this case since he is entitled to summary judgment.

Defendants' request for qualified immunity need not be addressed since they are entitled to summary judgment on the merits of Plaintiff's claim.

//

//

## RECOMMENDATION

As set forth herein, this Court finds that Defendants have met their burden moving for summary judgment, but Plaintiff neither meets his burden moving for summary judgment or opposing Defendants' motion.

Accordingly, the Court **RECOMMENDS**:

(1)  that Defendants Dr. Igbinosa, Dr. Kandkborova, Dr. Schraffenberg, Dr. Sundaram, and Dr. Ugwueze are entitled to judgment as a matter of law and their Motion for Summary Judgment, filed on March 1, 2018, (Doc. 63), should be **GRANTED**;

(2)  that Plaintiff is not entitled to judgment as a matter of law and his Motion for Summary Judgment, filed on February 9, 2018, (Doc. 58), should be **DENIED**; and

(3)  that the Clerk of the Court should be directed to enter judgment against Plaintiff and for Defendants and close this case.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). __**Within 21 days**__ after being served with these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   __**July 25, 2018**__                                 /s/ *Sheila K. Oberto*
                                                      UNITED STATES MAGISTRATE JUDGE